In contrast, I do not believe that school officials can reasonably be thought to endorse or condone a message worn on a student's T-shirt simply because they do not prohibit the student from wearing the T-shirt to school. *See Bd. of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 250 (1990) (plurality) ("We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support speech that it merely permits on a nondiscriminatory basis. . . . The proposition that schools do not endorse everything they fail to censor is not complicated.") (citations omitted).

### IV.

In sum, the Supreme Court's First Amendment jurisprudence prohibits school officials from telling a student that he cannot wear a particular T-shirt simply because they perceive that the T-shirt is communicating a message with which they disagree. Because I believe that a reasonable jury could conclude that this is exactly what the School did in the present case, I respectfully dissent from the majority's decision to affirm the grant of summary judgment in favor of the School on Boroff's First Amendment claim. I would therefore reverse the judgment of the district court to the extent that it entered summary judgment for the School on this claim, and remand the case for trial.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0249P (6th Cir.)
File Name: 00a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

NICHOLAS J. BOROFF,
  *Plaintiff-Appellant,*

  *v.*                                                   No. 98-3869

VAN WERT CITY BOARD OF
EDUCATION; JOHN BASINGER;
WILLIAM CLIFTON; and
DAVID FROELICH,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 97-07622—David A. Katz, District Judge.

Submitted: March 10, 2000

Decided and Filed: July 26, 2000

Before: WELLFORD, SILER, and GILMAN, Circuit
Judges.

—————————

### COUNSEL

**ON BRIEF:** Chris K. Starkey, STARKEY LAW OFFICES,
Fort Wayne, Indiana, for Appellant. Paul R. Bonfiglio, LAW

OFFICE OF PAUL R. BONFIGLIO, Toledo, Ohio, for Appellees.

WELLFORD, J., delivered the opinion of the court, in which SILER, J., joined. GILMAN, J. (pp. 13-20), delivered a separate dissenting opinion.

—————————

## OPINION

—————————

HARRY W. WELLFORD, Circuit Judge.  After Van Wert (Ohio) High School administrators told Nicholas Boroff that he was not allowed to wear "Marilyn Manson" T-shirts to school, Boroff's mother initiated this action on his behalf pursuant to 42 U.S.C. § 1983, alleging that the administrators' refusal to let him wear the T-shirts violated his rights under the First and Fourteenth Amendments.  The district court entered summary judgment in favor of the Van Wert City Board of Education and each of the school administrators who were named as defendants.  We **AFFIRM** the decision of the district court.

## I.  BACKGROUND

This dispute arises out of a high school student's desire to wear "Marilyn Manson" T-shirts to school, and the school's opposing desire to prohibit those T-shirts.  Marilyn Manson is the stage name of  "goth" rock performer Brian Warner, and also the name of the band in which he is the lead singer.  *See* ENCARTA WORLD ENGLISH DICTIONARY (2000) <http://dictionary.msn.com/find/entry.asp?search=goth> (defining "goth" as "a style of popular music that combines elements of heavy metal with punk" and also "a style of fashion . . . characterized by black clothes, heavy silver jewelry, black eye make-up and lipstick, and often pale face make-up").  Band members take the first part of their stage names from a famous model or celebrity, such as Marilyn Monroe, Madonna, or Twiggy, and the second part from a

Because nothing in either *Fraser* or *Kuhlmeier* purports to overrule *Tinker* (indeed, *Tinker* was recently cited with approval by the Supreme Court in *United States v. Playboy Entertainment Group, Inc.*, 120 S. Ct. 1878, 1888 (2000)), I believe that it should be left to the Supreme Court to determine whether and when *Tinker* should be cast by the wayside.  *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (cautioning the lower courts to accord the Supreme Court "the prerogative of overruling its own decisions."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 486 (1989) (Stevens, J., dissenting) (describing as "an indefensible brand of judicial activism" the refusal of lower courts to apply controlling Supreme Court precedent based upon a prediction that the Supreme Court would abandon its prior holding).

Instead, in both *Fraser* and *Kuhlmeier*, the Supreme Court distinguished *Tinker* by noting that the school officials in the latter cases might reasonably have been thought to be endorsing or condoning the student expression at issue had they taken no action.  In *Fraser*, the student campaign speech at issue occurred at an assembly during school hours that students were expected to attend.  *See Fraser*, 478 U.S. at 677 (noting that the students were required to attend the assembly or report to study hall).  (Fraser's speech was also vulgar.) *Kuhlmeier* involved a student newspaper that was funded and sponsored by the school itself.  *See Kuhlmeier*, 484 U.S. at 271 ("[A] school may in its capacity as publisher of a school newspaper or producer of a school play 'disassociate itself' not only from speech that would 'substantially interfere with [its] work . . . or impinge upon the rights of other students,' but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.") (second alteration in original) (quoting *Fraser*, 478 U.S. at 685; *Tinker*, 393 U.S. at 509).  This distinction was critical to both the *Fraser* and *Kuhlmeier* decisions.

I also believe that the majority dropped its guard much too quickly at the School's conclusory invocation of "disruptive and demoralizing values." I am quite confident that the school officials in *Tinker* thought it would be highly disruptive and demoralizing—not to mention downright unpatriotic—for students to wear black armbands in order to protest a war in which thousands of American soldiers were fighting and dying. The Supreme Court nevertheless concluded that the officials could not prohibit the students from wearing the armbands in the absence of evidence that a ban would be necessary to prevent "material and subtantial interference with schoolwork or discipline." *Id*.

### III.

This brings me to the last, but certainly not least important, matter on which I disagree with the majority. The majority apparently reads the Supreme Court's opinions in *Fraser* and *Kuhlmeier* as essentially overruling *Tinker*, concluding that after *Fraser* and *Kuhlmeier*, school officials can forbid whatever student speech they consider "offensive" (in the sense of promoting "disruptive and demoralizing values"), as long as their decision does not appear "manifestly unreasonable."

That, however, is not what the Supreme Court held in either *Fraser* or *Kuhlmeier*. *Fraser* concluded that school officials could temporarily suspend a high school student who persisted in giving a speech permeated with obvious sexual metaphors during a school assembly, despite being warned that the speech was "inappropriate" and that delivering it might result in "severe consequences." *Kuhlmeier* concluded that high school administrators do not offend the First Amendment by exercising editorial control over the style and content of school-sponsored publications as long as their actions are reasonably related to legitimate pedagogical concerns.

notorious serial killer, such as Charles Manson, John Wayne Gacy, or Richard Ramirez. Marilyn Manson (the individual) is popularly regarded as a worshiper of Satan, which he has denied. *See* Neil Strauss, *Stage Fright*, ROLLING STONE, June 26 1997, at 20. He is also widely regarded as a user of illegal drugs, which he has not denied. In fact, one of his songs is titled "I Don't Like the Drugs (But the Drugs Like Me)." *See* David Brown, *1998: The Best and Worst/Music*, ENTERTAINMENT WEEKLY, Dec. 25, 1998, at 140; *see also* Gina Vivinetto, *Marilyn Manson, Not Kinder, Not Gentler*, ST. PETERSBURG TIMES, Mar. 26 1999, at 23 (reporting that Manson no longer stores his drugs and drug paraphernalia in lunch boxes because "everyone . . . is carrying their paraphernalia that way. Too trendy").

On August 29, 1997, Boroff, then a senior at Van Wert High School, went to school wearing a "Marilyn Manson" T-shirt. The front of the T-shirt depicted a three-faced Jesus, accompanied by the words "See No Truth. Hear No Truth. Speak No Truth." On the back of the shirt, the word "BELIEVE" was spelled out in capital letters, with the letters "LIE" highlighted. Marilyn Manson's name (although not his picture) was displayed prominently on the front of the shirt.[1] At the time, Van Wert High School had in effect a "Dress and Grooming" policy that provided that "clothing with offensive illustrations, drug, alcohol, or tobacco slogans . . . are not acceptable." Chief Principal's Aide David Froelich told Boroff that his shirt was offensive and gave him the choice of turning the shirt inside-out, going home and changing, or leaving and being considered truant. Boroff left school.

On September 4, 1997, which was the next school day, Boroff wore another Marilyn Manson T-shirt to school. Boroff and his mother met that day with Froelich, Principal William Clifton, and Superintendent John Basinger. Basinger

---

[1] Though the origin of the T-shirt is unknown, the distorted portrayal of Jesus seems to have been created in an effort to illustrate the band's hit album "AntiChrist Superstar."

told the Boroffs that students would not be permitted to wear Marilyn Manson T-shirts on school grounds. Undaunted, Boroff wore different Marilyn Manson T-shirts on each of the next three school days, September 5, 8, and 9, 1997. The shirts featured pictures of Marilyn Manson, whose appearance can fairly be described as ghoulish and creepy. Each day, Boroff was told that he would not be permitted to attend school while wearing the T-shirts.

Boroff did not attend school for the next four days following September 9, 1997. On the fifth day, September 16, 1997, his mother initiated the present suit in the United States District Court for the Northern District of Ohio, alleging that the administrators' refusal to allow her son to wear Marilyn Manson T-shirts in school violated his First Amendment right to free expression and his Fourteenth Amendment right to due process. (After his eighteenth birthday, Boroff was substituted for his mother as the plaintiff.) The complaint named as defendants the Van Wert City Board of Education, Chief Principal's Aide Froelich, Principal Clifton, and Superintendent Basinger (collectively, the School). Boroff requested a temporary restraining order and moved for a preliminary injunction. The district court, following a hearing on September 16, 1997, denied both. Following discovery, both Boroff and the School moved for summary judgment. In a memorandum and order dated July 6, 1998, the district court entered summary judgment in favor of the School. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* a district court's decision to grant or deny summary judgment. *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). In deciding a motion for

activities. Indeed, that was the holding of *Tinker. See Tinker*, 393 U.S. at 511 ("[S]chool officials cannot suppress expressions of feelings with which they do not wish to contend.") (citation and internal quotation marks omitted); *Dambrot v. Central Michigan Univ.*, 839 F. Supp. 477, 484 (E.D. Mich. 1993) (concluding that a public university's "discriminatory harassment policy" that prohibited "symbols, [epithets,] or slogans that infer negative connotations about an individual's racial or ethnic affiliation," but permitted those that inferred positive or neutral connotations, was "as remarkable as it is illegal"), *aff'd*, 55 F.3d 1177 (6th Cir. 1994).

The majority asserts that "the School prohibited the Marilyn Manson T-shirts," including the three-headed Jesus T-shirt that precipitated this case, "because this particular rock group promotes disruptive and demoralizing values which are inconsistent with and counter-productive to education." It is not clear, however, what "disruptive and demoralizing values" the majority is referring to. If the majority is suggesting that the School could have concluded that Marilyn Manson's apparent endorsement of, say, illegal drug use, makes his picture an unacceptable image for students to wear in high school, I would agree. A fair reading of the record, however, suggests that the "disruptive and demoralizing values" that the School was really concerned about was disrespect for a specific venerated religious figure.

Or so a reasonable jury could have found. As noted above, however, school officials are not free to decide that only one side of a topic is open for discussion because the other side is too repugnant or demoralizing to listen to. *See Tinker*, 393 U.S. at 508 ("Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . .").

## II.

I also believe that the majority misapprehends the meaning of the terms "vulgar" and "offensive." In First Amendment cases, those terms refer to words and phrases that are themselves coarse and crude, regardless of whether one disagrees with the overall message that the speaker is trying to convey. Roughly speaking, they are the words and phrases that might have appeared on comedian George Carlin's list of words that one cannot say on the radio. *See generally FCC v. Pacifica Foundation*, 438 U.S. 726, 751-55 (1978) (reprinting Carlin's "Filthy Words" monologue). That is why the high school administrators in *Pyle v. South Hadley School Committee*, 861 F. Supp. 157, 159 (D. Mass. 1994), were allowed to prohibit a student from wearing a T-shirt proclaiming "See Dick Drink. See Dick die. Don't Be a Dick." *See id.* at 167-68 & nn. 8-9 (distinguishing *Tinker v. Des Moines Independent Community School Board*, 393 U.S. 503 (1969), because "[u]nlike *Tinker*, this is not a case about whether a particular viewpoint may be expressed."). The school administrators in *Pyle* were obviously not objecting to the message that drunk driving is bad and should be discouraged.

If Boroff had worn a T-shirt featuring Marilyn Manson's name and the song lyrics contained in the majority's opinion, this would be a very easy case. A number of those words are vulgar, regardless of whether one likes or dislikes Marilyn Manson's music or agrees or disagrees with whatever message Boroff would be trying to convey by wearing the shirt. But that sort of vulgarity is absent from the three-headed Jesus T-shirt that Boroff wore. This particular T-shirt was found "offensive" because it expresses a viewpoint that many people personally find repellent, not because it is vulgar.

Censorship on that basis is simply not permitted in the absence of a reasonable prediction by school officials of substantial disruption of, or material interference with, school

summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the non-moving party." *Id.* at 252.

### B.  First Amendment Claim

"It is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), the First Amendment rights of students in the public schools must be "applied in light of the special characteristics of the school environment." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506). With those precepts in mind, we apply the *Tinker-Fraser-Kuhlmeier* trilogy to the facts of this case.

In *Tinker*, a few students wore black armbands to school "to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Tinker*, 393 U.S. at 514. The school prohibited the armbands and suspended any student who was found wearing them. The Supreme Court held that the school's actions violated the students' freedom of speech. The Court noted that "[t]he problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style or deportment. . . . Our problem involves direct, primary First Amendment rights akin to 'pure speech.'" *Id.* at 507-08. The

Court concluded that to justify the prohibition of a particular expression of opinion, the school must "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. The prohibition of the armbands, the Court held, could not be sustained without showing that engaging in the prohibited conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

Several years later, in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), the Court "cast some doubt on the extent to which students retain free speech rights in the school setting." *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 737 (7th Cir. 1994). In *Fraser*, the Court held that a school district acted within its permissible authority in disciplining a student who gave an offensively lewd and indecent speech at a school assembly. In reaching its conclusion, the Court noted "[t]he marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of respondent's speech in this case." *Fraser*, 478 U.S. at 680. The Court recognized "that the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings." *Id.* at 682. It distinguished *Tinker* because the vulgar and offensive speech at issue was "unrelated to any political viewpoint." *Id.* at 685. The Court ultimately held that the school district had the authority to determine that the vulgar and lewd speech at issue would undermine the school's basic educational mission. *Id.*

In *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Court echoed its position in *Fraser* that "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission . . . even though the government could not censor similar speech outside the school.'" *Kuhlmeier*, 484 U.S. at 266 (quoting *Fraser*, 478

shirt was perceived to express a political or religious viewpoint. Principal Clifton said so himself. It appears unmistakable that the reason why the three-headed Jesus T-shirt was deemed "offensive" was because it said something about a venerated religious figure, and because many people in Van Wert (presumably including Principal Clifton) happen to disagree vehemently with what they perceived the T-shirt as saying. Indeed, from Principal Clifton's explanation, it would not be unreasonable to presume that if the T-shirt had depicted Jesus in a positive light, it would not have been considered "offensive."

Consistent with the Supreme Court's First Amendment jurisprudence, taking sides in that manner would be considered viewpoint discrimination, which is accompanied by an all-but-irrebuttable presumption of unconstitutionality. *See*, *e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995) (describing viewpoint discrimination as "an egregious form of content discrimination" and observing that "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 61 (Brennan, J., dissenting) ("Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not."); *Bullfrog Films, Inc. v. Wick*, 646 F. Supp. 492, 505-06 (C.D. Cal. 1986) (observing that "regulations that discriminate on the basis of the content of speech" are generally not tolerated under the First Amendment, but that even when content-based regulation is permitted, "discrimination on the basis of political or other views is never tolerated."), *aff'd*, 847 F.2d 502 (9th Cir. 1988).

identified with illegal drug use or other unlawful activities that T-shirts bearing their images are unacceptable for high school students to wear in school. *See, e.g., Williams v. Spencer*, 622 F.2d 1200, 1206 (4th Cir. 1980) (concluding that school officials could halt the distribution of an independent underground school newspaper that contained an advertisement for a store that sold drug paraphernalia). In fact, after the Supreme Court's decisions in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), I suspect that forbidding a student from wearing a T-shirt simply because it makes a statement with which school administrators disagree is one of a very few decisions about student dress that school administrators are *not* allowed to make. Nevertheless, from the record presented, a reasonable jury could easily conclude that this was exactly what the School did.

I believe that the School in this case came perilously close to admitting that its decision to prohibit Boroff from wearing the three-headed Jesus T-shirt was made precisely because the School found the T-shirt's viewpoint repugnant. Principal Clifton explained in an affidavit that

> I have found the t-shirt which contains the three-faced Jesus to be offensive. . . . This t-shirt is offensive because it mocks a major religious figure. Mocking any religious figure is contrary to our educational missions which is to be respectful of others and others' beliefs. Second, mocking this particular religious figure is particularly offensive to a significant portion of our school community, including students, teachers, staff members and parents.

In view of this explanation, I am at a loss to understand how the majority can say that "[t]he record is devoid of any evidence that the T-shirts, the 'three-headed Jesus' T-shirt particularly, were perceived to express any particular political or religious viewpoint." Of course the three-headed Jesus T-

U.S. at 685). In *Kuhlmeier*, the Court held that the school district in that case did not violate the First Amendment by exercising editorial control over the content of student speech in a school-sponsored publication "so long as [the school's] actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. The Court distinguished between the First Amendment analysis applied in *Tinker* and the analysis applied in *Fraser*, noting that the decision in *Fraser* rested on the vulgar and offensive character of the speech, whereas *Tinker* rested on the propensity of the speech materially to disrupt classwork or involve substantial disorder. *Id.* at 271 n.4.

The district court below determined that the rule in *Fraser* applied to this case, concluding that "[a] school may prohibit a student from wearing a T-shirt that is offensive, but not obscene, on school grounds, even if the T-shirt has not been shown to cause a substantial disruption of the academic program." The court then held that the School did not act in a manifestly unreasonable manner in finding the T-shirts offensive and in enforcing its dress code.

In this appeal, Boroff argues that the district court erred in granting summary judgment to the School. In his appellate brief he maintains:

> The way to analyze this is to first determine whether the speech is 'vulgar or offensive'. If it is, then *Fraser* allows banning it, and the analysis is complete. Otherwise, apply *Tinker* and examine if there is a threat of substantial disruption such that would allow the school to ban the speech.

Appellant's Brief at 8. Boroff claims that the administrators' decision that the T-shirts are offensive was manifestly unreasonable and unsupported by the evidence. Boroff relies to a great extent on evidence that similar T-shirts promoting other bands, such as Slayer and Megadeth, were not prohibited, and also on evidence that one other student was

not prohibited from carrying a backpack that donned three "Marilyn Manson" patches. Because the T-shirts were not "offensive," Boroff reasons, and because there is no evidence that a substantial disruption would arise from his wearing the T-shirts, then the School violated his First Amendment rights. We disagree.

The standard for reviewing the suppression of vulgar or plainly offensive speech is governed by *Fraser, supra. See Chandler v. McMinnville School District*, 978 F.2d 524, 529 (9th Cir. 1992) (finding that school buttons containing inoffensive terms may not be prohibited absent a showing of a reasonable forecast of substantial disruption in school activities). The School in this case, according to the affidavit of Principal Clifton, found the Marilyn Manson T-shirts to be offensive because the band promotes destructive conduct and demoralizing values that are contrary to the educational mission of the school. Specifically, Clifton found the "three-headed Jesus" T-shirt to be offensive because of the "See No Truth. Hear No Truth. Speak No Truth." mantra on the front, and because of the obvious implication of the word "BELIEVE" with "LIE" highlighted on the back. The principal specifically stated that the distorted Jesus figure was offensive, because "[m]ocking any religious figure is contrary to our educational mission which is to be respectful of others and others' beliefs." The other T-shirts were treated with equal disapproval. Clifton went on to explain the reasoning behind the School's prohibition of the T-shirts generally:

17. Although I do not know if [Boroff] intends to communicate anything when wearing the Marilyn Manson t-shirts, I believe that the Marilyn Manson t-shirts can reasonably be considered a communication agreeing with or approving of the views espoused by Marilyn Manson in its lyrics and those views which have been associated to Marilyn Manson through articles in the press. I find some of the Marilyn Manson lyrics and some of the views associated with Marilyn Manson as reported in articles in the news and entertainment press

---

**DISSENT**

---

RONALD LEE GILMAN, Circuit Judge, dissenting. Summary judgment is unquestionably a valuable means for avoiding unnecessary trials, *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987), but it is usually inappropriate in civil rights cases when there are disputed and material questions about the reasonableness of an official's actions or about an official's intent. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (concluding that state university regents were not entitled to summary judgment on the First Amendment claim of an untenured professor who had raised a genuine issue of material fact as to whether retaliation was the reason that his contract was not renewed); *Honore v. Douglas*, 833 F.2d 565, 569 (5th Cir. 1987) (observing that summary judgment is "an inadequate procedure for sorting out nebulous questions of motivation" in a First Amendment retaliation case); 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2732.2, pp. 153-54 & n.5, 176-77 & n.19 (3d ed. 1998) (noting that questions regarding the reasonableness of officials' actions in First Amendment cases may preclude the entry of summary judgment). Unlike the majority, I believe that a jury could reasonably find that the reason why School officials declared Boroff's Marilyn Manson T-shirts "offensive" was because the first Marilyn Manson T-shirt he wore contained a message about religion that they considered obnoxious. Accordingly, I believe that summary judgment in favor of the Board on Boroff's First Amendment claim was inappropriate, and therefore respectfully dissent.

I.

I have little doubt that school administrators may reasonably decide that certain rock performers are so closely

appellant in a perfunctory manner, unaccompanied by some effort at developed argumentation, are considered abandoned). In any event, Boroff is not claiming that the School utilized unfair procedures in prohibiting him from wearing Marilyn Manson T-shirts to school. We therefore have no need to consider a procedural due process argument.

Moreover, Boroff would have no cognizable substantive due process claim under the law of this circuit even if it had been properly preserved. *See Gfell v. Rickelman*, 441 F.2d 444, 446 (6th Cir. 1971) (rejecting the argument that "the freedom of choosing one's hair style is a fundamental right"); *Jackson v. Dorrier*, 424 F.2d 213, 218 (6th Cir. 1970) (per curiam) (rejecting the argument that high school students have a constitutionally protected privacy interest in being able to wear long hair to school). *But see Massie v. Henry*, 455 F.2d 779, 782 (4th Cir. 1972) (concluding that high school students have a liberty or privacy interest in governing their physical appearance in school); *Bishop v. Colaw*, 450 F.2d 1069, 1075 (8th Cir. 1971) (same); *Breen v. Kahl*, 419 F.2d 1034, 1036 (7th Cir. 1969) (same). In any event, the Supreme Court has repeatedly emphasized that substantive due process is not to be used as a fallback constitutional provision when another provision or amendment (in this case, the First Amendment) directly addresses the subject. *See Conn v. Gabbert*, 526 U.S. 286, 293 (1999) ("We have held that where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of 'substantive due process.'") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

### III. CONCLUSION

For the foregoing reasons and for the reasons stated in its opinion, we **AFFIRM** the decision of the district court.

offensive to our basic educational mission at Van Wert High School. Therefore, I believe that all of the Marilyn Manson t-shirts . . . are offensive to and inconsistent with our educational mission at Van Wert High School.

Furthermore, Clifton quotes some of the lyrics from Marilyn Manson songs that the School finds offensive, which include (but certainly are not limited to) lines such as, "you can kill yourself now because you're dead in my mind," "let's jump upon the sharp swords/and cut away our smiles/without the threat of death/there's no reason to live at all," and "Let's just kill everyone and let your god sort them out/Fuck it/Everybody's someone else's nigger/I know you are so am I/I wasn't born with enough middle fingers." The principal attested that those types of lyrics were contrary to the school mission and goal of establishing "a common core of values that include . . . human dignity and worth . . . self respect, and responsibility," and also the goal of instilling "into the students, an understanding and appreciation of the ideals of democracy and help them to be diligent and competent in the performance of their obligations as citizens."

Clifton also submitted to the district court magazine articles that portray Marilyn Manson as having a "pro-drug persona" and articles wherein Marilyn Manson himself admits that he is a drug user and promotes drug use. Clifton concludes from his fourteen years of experience that children are genuinely influenced by the rock group and such propaganda.

Affidavits of other School officials support the administration's position that the Marilyn Manson T-shirts, generally speaking, were prohibited because they were "counter-productive and go against the educational mission of the Van Wert City School District community." Affidavit of John Basinger ¶ 5. *See also* Affidavit of David Froelich, ¶ 11 (stating view that the T-shirts are a distraction and are "contrary to our educational mission"); Affidavit of Rita Hurless, ¶ 5 (stating the School's conclusion that Marilyn Manson T-shirts "have no business in a school setting" and

are "associated with values that are counterproductive and contrary to the educational mission of the Van Wert City School District"). The record is devoid of any evidence that the T-shirts, the "three-headed Jesus" T-shirt particularly, were perceived to express any particular political or religious viewpoint.

Under these circumstances, we find that the district court was correct in finding that the School did not act in a manifestly unreasonable manner in prohibiting the Marilyn Manson T-shirts pursuant to its dress code. The Supreme Court has held that the school board has the authority to determine "what manner of speech in the classroom or in school is inappropriate." *Fraser*, 478 U.S. at 683. The Court has determined that "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission . . . even though the government could not censor similar speech outside the school.'" *Kuhlmeier*, 484 U.S. at 266 (quoting *Fraser*, 478 U.S. at 685). In this case, where Boroff's T-shirts contain symbols and words that promote values that are so patently contrary to the school's educational mission, the School has the authority, under the circumstances of this case, to prohibit those T-shirts.

The dissent would find that the evidence was sufficient for a reasonable jury to infer that the School has engaged in "viewpoint discrimination" by prohibiting the T-shirts, similar to the armband prohibition in *Tinker*. The dissent primarily relies on one sentence in Principal Clifton's affidavit, in which Clifton stated that he found the "three-headed Jesus" T-shirt to be offensive because "it mocks a major religious figure." Under that reasoning, if a jury finds that the School has prohibited the T-shirts because of any viewpoint expressed on the shirts, then the School must show that it reasonably predicted that allowing the T-shirts would have caused a substantial disruption of, or material interference with, school activities. *See Tinker*, 393 U.S. at 509.

In our view, however, the evidence does not support an inference that the School intended to suppress the expression of Boroff's viewpoint, because of its religious implications. Rather, the record demonstrates that the School prohibited Boroff's Marilyn Manson T-shirts generally because this particular rock group promotes disruptive and demoralizing values which are inconsistent with and counter-productive to education. The dissenting judge agrees that "[i]f the only T-shirts at issue in this case were the ones that simply displayed illustrations of Marilyn Manson largely unadorned by text, the judgment of the district court might be sustainable." He reasons, however, that the one T-shirt featuring the distorted Jesus figure may have been prohibited because of the School's disagreement with its religious message. In our view, the School's treatment of the "three-headed Jesus" T-shirt and the others is not distinguishable. The record establishes that all of the T-shirts were banned in the same manner for the same reasons--they were determined to be vulgar, offensive, and contrary to the educational mission of the school. *See Pyle v. South Hadley School Committee*, 861 F. Supp. 157, 159 (D. Mass. 1994) (upholding a prohibition on T-shirt proclaiming "See Dick drink. See Dick drive. See Dick die. Don't be a Dick." and "Coed Naked Band: Do It To The Rhythm.").

In sum, we are of the view that the School has the authority to prohibit Marilyn Manson T-shirts under these circumstances.

**C. Fourteenth Amendment Claim**

As for Boroff's Fourteenth Amendment claim, we do not believe that it was preserved for our review. Boroff suggests that the School's actions violated his right to "due process," but he does not discuss this claim at all in his brief on appeal. *Cf. Bush v. Dictaphone Corp.*, 161 F.3d 363, 370 (6th Cir. 1998) (noting that claims not pursued on appeal will typically be considered abandoned); *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (holding that issues raised by an